UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ROBERT A. BAKER AND ELSA M. BAKER, *plaintiffs,* | Civil Action |
| | Section        , Division |
| versus | District Judge |
| NEWTEK SMALL BUSINESS FINANCE, LLC, *defendant.* | Magistrate Judge |

### COMPLAINT FOR DAMAGES

Robert A. Baker and Elsa M. Baker ("Bakers") submit the following to support their *Complaint for Damages* ("*Complaint*"):

### Nature of the *Complaint*

1.   A $3 million SBA loan debt was extinguished in 2014 when a bank foreclosed upon property (without appraisal) which was valued at $2.8 million at the loan's 2011 inception. The Bakers were personal guarantors of the loan and, despite their obvious Louisiana Deficiency Judgment Act defense, the lending bank continues to pursue them.

2.   Among the lending bank's tactics, which were unknown to the SBA:

   a.   refusal to cease collection efforts on a debt which was years before extinguished by Louisiana's Deficiency Judgment Act;

   b.   seizure of the Bakers' home which it argues still secures the (unenforceable) debt;

   c.   seizure of an adjacent piece of Baker property in which it never held a security interest; and

   d.   impermissibly encumbering Bakers' properties with putative security interests (some of which they still refuse to cancel), including

an illegal UCC1 financing statement against an unimproved immovable;

    e.  repeatedly misleading the Bakers that a federal agency dictated the bank's wrongful collection and enforcement practices.

3.    The Bakers seek general and special damages, statutory enhanced damages, and attorney's fees and costs, under various theories of liability including wrongful seizure, abuse of process, slander of title, and unfair and deceptive trade practices.

## Parties

4.    Plaintiff Robert A. Baker ("Bob Baker") is a natural person of the full age of majority; he is a citizen of the State of Louisiana and resides in the Parish of St. Tammany.

5.    Plaintiff Elsa M. Baker is a natural person of the full age of majority; she is a citizen of the State of Louisiana and resides in the Parish of St. Tammany.

6.    Made defendant is Newtek Small Business Finance, LLC ("Newtek").

7.    Newtek is a juridical person organized in and under the laws of the State of New York with its principal places of business in the State of New York.

8.    A limited liability company, Newtek is upon information and belief comprised of four members: Barry Sloane, Peter Downs, Rich Salute, and Sam Kirschner.

9.    None of Newtek's members is a citizen of the State of Louisiana.

10.   Each of Newtek's members is a citizen of the State of New York.

## Subject matter jurisdiction

11.   Under 28 U.S.C. § 1332, this Court may exercise original jurisdiction over the subject matter of the Bakers' civil claims, where:

    a.  the Bakers are both citizens of the State of Louisiana;

b.  Newtek is not a citizen of the State of Louisiana;

c.  Newtek is a citizen of the State of New York; and

d.  the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

## Venue

12.  This district is the appropriate forum under:

a.  28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the Bakers' claims occurred in this district, where Newtek employed wrongful business practices to the Bakers' detriment; and/or

b.  28 U.S.C. § 1391(b)(3) and (d), because Newtek is subject to the court's exercise of personal jurisdiction regarding this action because Newtek lends money within this district as its principal business pursuit.

## Baker Sales, Inc.

13.  Plaintiff Bob Baker founded Baker Sales, Inc. ("BSI") in 1978 for the wholesale distribution of steel pipe, fence pipe, and fence supplies to oil-related businesses in southeast Louisiana.

14.  In 2000, BSI took a $550,000 Small Business Administration ("SBA") Loan, and another $400,000 in 2002, for working capital and operation costs.

15.  In 2009, Bob Baker was named SBA's Louisiana Small Business Person of the Year.

16.  By 2011, BSI serviced a 250-mile radius and had expanded beyond the oilfield industry to include providing products to contractors and plumbers, and fence supply companies and fence contractors.

### The debt at issue;
### the *BSI Notes* and the security given

17. On March 28 or 29,[1] 2011, Newtek loaned Baker Sales $1,960,000 and $1,215,000, again through an SBA program.

18. In return, BSI made two promissory notes ("*BSI Notes*") payable to Newtek's order.

19. The *BSI Notes* were each secured by BSI's conventional mortgage ("*BSI Mortgages*") on commercial property ("Camp Villere Facility") owned by BSI.

20. BSI further secured the performance of each *BSI Note* with a *General Security Agreement* ("*BSI Security Agreements*"), each of which collateralized all BSI's movables ("BSI Movables").

### *Baker Guaranties*

21. Newtek took additional security on the *BSI Notes* with personal guarantees ("*Baker Guarantees*") from Bob Baker and his wife, Elsa.

22. The performance of the *Baker Guarantees* was in turn secured by a conventional mortgage ("*Baker Mortgages*") on the Bakers' home ("Roan Lane Home").

---

[1] It is unclear when the loans were made, because the notes, mortgages, and guaranties each bear two separate dates (March 28, 2011 and March 29, 2011) for appearance and/or execution.

23.    The financing arrangement for the *BSI Notes* is illustrated below:





**2013 Baker Sales bankruptcy;
Newtek stay lift motion**

24.   On September 30, 2013, Baker Sales sought Chapter 7 protection in the United States Bankruptcy Court for the Eastern District of Louisiana.[2]

25.   On November 7, 2013, Newtek filed a sworn proof of claim ("*Newtek POC*") in the bankruptcy, indicating the *BSI Notes* were <u>100% secured by Newtek's security interest(s) in "all property of Debtor" – in the amount of $3,044,569.46.</u>

---

[2] *In re Baker Sales, Inc.*, No. 13-12693 "B" in United States Bankruptcy Court, Eastern District of Louisiana.

26. The *Newtek POC* indicated that the <u>Uniform Commercial Code ("UCC") provided</u> <u>the basis for Newtek's perfection of the security interests in "all property of the</u> <u>Debtor."</u>

27. Also on November 7, Newtek moved to lift the bankruptcy stay to foreclose against all BSI's assets securing the *BSI Notes* [R. Doc. 11 in No. 13-12693, E.D.La. Bankr.].

28. On December 5, 2013, Bankruptcy Judge Jerry Brown granted the stay lift motion [R. Doc. 19], permitting Newtek to proceed against all BSI's assets in state court.

### 2014 state court foreclosure.

29. On March 14, 2014, Newtek filed a *Petition for Executory Process ("2014 Foreclo-sure")* in the 22nd Judicial District Court (Parish of St. Tammany) seeking to fore-close on the *BSI Mortgages* and *BSI Security Agreements*[3] based on the unpaid *BSI Notes* which it alleged totaled $3,044,569.46.

30. Named as defendants were BSI, Robert A. Baker, and Elsa M. Baker.

31. On April 10, 2014, a *Writ of Seizure and Sale* issued.

32. On May 21, 2014, the Sheriff recorded the return, effecting seizure of the Camp Villere Facility and the BSI Movables.

33. On October 8, 2014, Newtek was the highest bidder when the Sheriff sold the Camp Villere Facility <u>without appraisal</u>.

34. When Newtek approved the loans in 2011, the Camp Villere Facility was valued at $2,800,000.00.[4]

---

[3] *Newtek Small Business Finance, Inc. v. Baker Sales, Inc., Robert A. Baker, and Elsa M. Baker*, No. 201411226 "G" in 22nd Judicial District Court.

[4] Newtek did not dispute this fact in 2016 state court proceedings and acknowledged the amount in 2017 appellate oral argument.

35.   Between 2011 and the sheriff's sale in 2014, the Camp Villere Facility was improved by BSI.

36.   In 2014, at a sale Newtek prompted in foreclosure, Newtek essentially "sold itself" the Camp Villere property for $81,130.00, less than 3 percent of its fair market value.

### Newtek's curious "UCC mortgage" against Lot 127

37.   A few months after it "sold itself" the Camp Villere Facility, Newtek filed a UCC1 against a lot adjacent to the Bakers' Roan Lane Home (Lot 127 in the Lacombe Harbor Subdivision, Addition 8, "Lot 127").

38.   Newtek had no security interest in Lot 127 under the *Baker Mortgages*.

39.   Lot 127 at all times was an unimproved immovable.

40.   UCC security devices may not be used to encumber unimproved immovables, or any related collateral other than certain fixtures, under Louisiana's adoption of UCC Article 9. LA. REV. STAT. § 10:9-109(d)(11)

### 2015 abandonment of BSI Movables.

41.   The 2014 *Writ of Seizure and Sale* of the BSI Movables included BSI's accounts receivable, which Newtek took control of on January 9, 2015.

42.   BSI and Newtek made no agreement on the accounts receivables' value or what would be attributed to BSI's debt, if any even remained.

43.   On June 5, 2015, BSI gave Capital One permission to communicate with Newtek regarding the release of a bank lien encumbering a seized but unsold Hyster forklift.[5]

44.   But Newtek abandoned its BSI Movables foreclosure because a St. Tammany Parish tax lien encumbered the BSI Movables.

45.   Although the BSI Movables were never appraised, St. Tammany Parish assessed their value in 2014 ($940,647) and again in 2015 ($1,034,707).

46.   The BSI Movables Newtek abandoned, minus the BSI receivables Newtek took control of, were sold in bankruptcy to a third party on in July 2015 for $42,500.00.

47.   Thus, both the Louisiana conventional mortgage (Camp Villere Facility) and UCC security agreement (BSI Movables) securing the *BSI Notes* were foreclosed upon without appraisal and with no agreement as to the value Newtek would attribute to BSI's debt.

48.   At no point, in state court litigation or otherwise, has Newtek ever disputed these facts.

### Newtek targets the Bakers' home.

49.   In mid-2015, as the BSI bankruptcy concluded and the BSI assets were depleted, Newtek approached BSI's bankruptcy attorney, Rachel Anderson, explaining that the Bakers could acquiesce to a "workout" in lieu of Newtek's "foreclosure," against their Roan Lane Home.

---

[5] The lift was not appraised, but at the time was conservatively valued in excess of $100,000. Newtek would eventually abandon this movable collateral.

50.  Anderson explained that the Bakers were concerned as they were well past their working years, they were developing health problems, they'd expended most of their savings trying to save BSI, and their home was their only asset.

51.  For months, despite Anderson's repeated requests, Newtek kept the Bakers in the dark about its intentions, occasionally soliciting a "workout" offer from the Bakers in lieu of threatened foreclosure.

52.  In October 2015, the Bakers retained undersigned counsel to explain to Newtek it had no right to foreclose against the Roan Lane Home after the Camp Villere Facility and BSI Movables were foreclosed upon without appraisal.

53.  As early as November 2015, undersigned counsel explained to counsel for Newtek that Louisiana's Deficiency Judgment Act prevented any future attempts to collect on the *BSI Notes* debt.

54.  In late 2015 and early 2016, to both Anderson and undersigned, Newtek represented that the decision on whether to pursue the Roan Lane Home was being made by the SBA, and not by Newtek.

55.  Newtek refused to indicate whether it would attempt foreclosure against the Bakers as guarantors of the *BSI Notes* debt, even despite the Louisiana Deficiency Judgment Act's prohibition.

**The deficiency/2016 foreclosure.**

56.   Despite its 2014 foreclosure against the Camp Villere Facility and certain BSI Movables (all without appraisal), and over the Bakers' protest, Newtek still seeks to satisfy an apparent deficiency on the *BSI Notes* debt.[6]

57.   On March 1, 2016, Newtek filed a *Petition for Executory Process* ("*2016 Foreclosure*") in the 22nd Judicial District Court, seeking to enforce the *Baker Guarantees* and foreclose upon the Bakers' Roan Lane Home.

58.   On March 14, 2016, the Court granted Newtek's request and executory process issued, directing the Sheriff to seize and sell the Bakers' Roan Lane Home.

59.   But Newtek also requested that the Sheriff seize Lot 127, which it never had a security interest in and which was "secured" with an illegal UCC filing.

60.   On March 17, 2016, the Sheriff effected seizure of the Roan Lane Home and Lot 127.

61.   The St. Tammany Parish Sheriff scheduled the Roan Lane Home and Lot 127 for sale on May 25, 2016, which was postponed to June 8, 2016.

**The Article 2751 injunction.**

62.   On April 14, 2016, the Bakers filed a *Petition for Injunction to Arrest Seizure and Sale* into the docket of the *2016 Foreclosure*, suggesting the following LA. CODE CIV. PROC. art. 2751 bases for preventing Newtek from proceeding by executory process:

   a.   the secured debt was unenforceable against the Bakers under the Louisiana Deficiency Judgment Act;

---

[6] The Bakers' position is based on more than law. As a practical matter, too, Newtek has been made whole and then some, with the Camp Villere Facility sheriff's sale netting Newtek a commercial asset worth well over $3 million dollars in 2014.

    b.  in five respects,[7] Newtek had failed to use proper procedure; and

    c.  Newtek was made whole on the BSI Notes debt when it foreclosed on BSI's physical plant (Camp Villere Facility) in 2014.

63.   Ruling from the bench at the May 19, 2016 hearing on the Bakers' Article 2751 injunction request(s), the district judge ordered that the sheriff's sale be cancelled because Newtek had seized property (Lot 127) in which it had no security interest.

64.   But the ruling was equally clear that Newtek could "amend" its petition to re-instigate executory process.

**Newtek "releases" Lot 127**

65.   Lot 127 is an unimproved lot adjacent to the Bakers' Roan Lane Home.

66.   Newtek never had a security interest in this piece of land.

67.   But Newtek filed a UCC1 financing statement against Lot 127 on December 8, 2014.

68.   Aside from being illegal in that Newtek never had a security interest in Lot 127, Louisiana law prohibits the attempted collateralization of an unimproved immovable by UCC recordation. LA. REV. STAT. § 10:9-109(d)(11).

69.   Had Newtek any security interest in Lot 127, it would have perfected that interest by way of a conventional mortgage; not by UCC filing.

70.   On June 27, 2016, Newtek filed a UCC3 Termination Statement regarding Lot 127.

---

[7] The *BSI Notes* were not produced; the *Baker Mortgages* were not produced in authentic form; Lot 127 was never Newtek's collateral; Lot 128's "UCC" encumbrance was inappropriate; Newtek presented no evidence that it was the "person entitled to enforce" or the "holder in due couse" of the *BSI Notes*. To date it is unclear whether Newtek can remedy any of these problems.

**Baker state court appeal**

71. In June 2016, the Bakers took an immediate (devolutive) appeal from the district judge's refusal to bar Newtek's eventual foreclosure under Louisiana's Deficiency Judgment Act.

72. The parties briefed and argued the issues.

73. Rather than getting a definitive legal answer on appeal, Newtek moved to dismiss the Bakers' appeal as premature; after all, the Bakers "won" below and there was nothing (executory process had been revoked) before the court to decide.

74. The Bakers argued there were no fact issues to resolve, the record before the Court was complete, the injunction below was granted only because Newtek had wrongfully seized Lot 127, and there was nothing to prevent Newtek from seizing the Roan Lane Home again – leaving the Bakers with no remedy other than to defend themselves on the same issues.

75. Foreclosure injunction appeals are devolutive, meaning Newtek can bully through with a sheriff's sale even while the Bakers' appeal is pending before the appeal court. No legal stay exists.

76. In April 2017, Louisiana's First Circuit Court of Appeals granted Newtek's motion to dismiss.

**The Bakers' present reality**

77. Since October 2014, Newtek has permitted a mortgage securing an unenforceable debt to encumber the Bakers' Roan Lane Home.

78. In March 2016, Newtek utilized Louisiana executory process to seize the Roan Lane Home to sell it.

79. Newtek refuses to litigate its entitlement *via ordinaria* as the Bakers have suggested.

80. Since mid-2015, the Bakers have lived under the constant threat that Newtek will foreclose; now they fear Newtek might "amend" its defective executory process to make another foreclosure attempt.

81. The Bakers sought guidance from the Louisiana First Circuit Court of Appeal to determine their defenses *vel non* against Newtek's pursuit of their home.

82. Newtek, despite acknowledging that the record contains no fact disputes and presented the First Circuit with clean questions of law, successfully moved to dismiss the Bakers' appeal as premature (as they were granted an injunction against foreclosure sale below); this impractical tactic forces the entire process to be played out again <u>and solely at Newtek's whim</u>.

83. The Bakers have made repeated requests for Newtek's intentions; they've made statutory demand that Newtek cancel its mortgage inscription against the Roan Lane Home.

84. To date, Newtek has refused to communicate with the Bakers or comply with their cancellation demands.

85. Bob Baker is 77 year old; Elsa is 72. Both are well past their working years, having exhausted much of their savings to save BSI from insolvency. The Bakers and their attorneys have repeatedly conveyed to Newtek the effect Newtek's continued pursuit of the Bakers, and the threat that their home might be taken from them, has on this aging couple.

**SBA played no role Newtek's collection activity**

86.  The Bakers have since learned, from the SBA deputy director, that Newtek's attempt to collect on the *BSI Notes* was wholly its own.

87.  At no point was the SBA aware of Newtek's attempt to foreclose for a second time to collect on the *BSI Notes* until undersigned counsel informed the SBA of the activity.

88.  Upon information and belief, as between Newtek and the SBA, Newtek's renegade liquidation attempts violate(d) the SBA's *Standard Operating Procedure – Loan Liquidation and Acquired Property* and Newtek would be rejected if it sought to have SBA make it whole on the loan.

**Reasons the Deficiency Judgment Act**
**bars Newtek's attempt to collect on *BSI Notes***

89.  Because Newtek foreclosed on the Camp Villere Facility and BSI Movables, without appraising them, the debt [*BSI Notes*] stands fully satisfied and discharged as to BSI, personally; Newtek may no longer proceed against BSI or its property. LA. REV. STAT. § 13:4106.A ("Louisiana Deficiency Judgment Act" or "LDJA").

90.  The Bakers' only link to Newtek is through the *Baker Guaranties*.

91.  The mortgage on the Roan Lane Home secures the *Baker Guaranties*; it doesn't secure the *BSI Notes*.[8]

92.  Guaranty is equivalent to suretyship in Louisiana.

---

[8] Even accepting Newtek's argument, that the Bakers mortgaged the Roan Lane Home to secure the *BSI Notes* [which the documents in this matter do not support], the Bakers still have all of the principal debtor's [BSI] rights and defenses under Louisiana Civil Code Article 3295.

93. Under Louisiana law, the surety (Bakers) may assert against the creditor (Newtek) any defense (LDJA) to the principal obligation (*BSI Notes*) that the principal obligor (BSI) could assert except lack of capacity or discharge in bankruptcy of the principal obligor. LA. CIV. CODE art. 3046.

94. <u>Additionally</u>, suretyship is a personal right, not a real right.

95. Because the LDJA bars Newtek from proceeding on the *BSI Notes* against BSI, <u>personally</u>, it also bars Newtek from doing so against its surety (Bakers).

96. The LDJA defense(s) are those which neither debtor nor surety can waive as a matter of Louisiana public policy. LA. REV. STAT. § 13:4107.

97. Time and again, Newtek claims that the Bakers don't have surety defenses and that they mortgaged their house to directly secure the *BSI Notes* (rather than to secure the *Baker Guaranties*, which secured the *BSI Notes*).

98. But even accepting that argument, "[i]n such a case, the mortgagor may assert against the mortgagee any defense to the obligation which the mortgage secures that the obligor could assert except lack of capacity or discharge in bankruptcy of the obligor." LA. CIV. CODE art. 3295.

**Newtek's fruitless attempt to
excuse itself from LDJA's bar**

99. At times, Newtek justified its foreclosure attempt by explaining that the Bakers waived their (unwaivable as a matter of Louisiana public policy) rights to defend with the LDJA.

100. At other times, Newtek argued that what it sought wasn't deficiency judgment attempt at all – that it was simply proceeding against the Bakers as guarantors of the *BSI Notes*.

101. And still at other times, Newtek argued that statutory exceptions to LDJA permitted it to seek its windfall at the Bakers' expense. Some examples include Newtek's threadbare argument that:

   a. LDJA § 4108(3) "bankruptcy exception" applies; and that its <u>2014 state court foreclosure</u> was really a "sale pursuant to an order of a United States Bankruptcy Court."

   b. there was a mortgage in this matter affecting two or more properties under LDJA § 4106.B; none of the multiple security devices in this matter concern "two or more properties."

   c. this was a LDJA § 4108.1 "commercial transaction," despite the fact that neither BSI nor the Bakers ever even discussed, much less reached an agreement regarding, the "reasonably equivalent value" of the credit the sale of Camp Villere Facility would apply against the alleged *BSI Notes* indebtedness.

102. Newtek is liable unto the Bakers under the following theories and for the following non-exclusive particulars:

### COUNT ONE:
### WRONGFUL SEIZURE; CONVERSION

103. The Bakers incorporate by reference to the contents of ¶¶ 1-102, above, as if they were re-alleged in their entirety herein.

104. Despite repeated queries in 2015 and 2016 in which the Bakers' attorneys reminded Newtek's counsel of both the Lot 127 problems and the LDJA's operation based on Newtek's failure to appraise in the *2014 Foreclosure*, Newtek:

   a. caused executory process to issue in order to seize Bakers' Lot 127, an immovable in which it never had a security interest; and

   b. caused executory process to issue in order to seize the Bakers' Roan Lane Home despite the fact that the underlying debt (*BSI Notes*) is barred by the LDJA.

105. Regardless of Newtek's state of mind or malice *vel non*, its actions evince its desire to permanently deprive the Bakers of both Lot 127 and the Roan Lane Home.

106. Newtek did, in fact, deprive the Bakers of both at least temporarily; such deprivation is a hallmark of seizure or conversion.

107. Without a legal right to do so, Newtek wrongfully seized or converted the Bakers' home and adjacent lot, entitling the Bakers to both general and special damages under Louisiana law.

108. Fresh on the heels of their family business' Chapter 7 bankruptcy, the Bakers' home was seized and scheduled for sheriff's sale; the Bakers have no family in the immediate area to help them and no prospect for meaningful employment to afford them a place to live.

109. The Bakers are entitled to recover for humiliation, mortification, mental anxiety, physical discomfort, inconvenience, none of which are confined to proof of actual pecuniary loss and none of which require proof of malice or that the seizure was characterized by harshness or some wanton disregard to the Bakers' interests, or anything other than the lack of Newtek's legal right to seize the Baker home and adjacent lot. .

110. Newtek was aware of the potential for these damages because the Bakers' attorneys repeatedly counseled Newtek's attorney about the strain Newtek's foreclosure threats put on the Bakers.

111. Of peculiar importance in the Court's appreciation of special damages are the damages which arise out of Newtek's wrongful seizure where the seizure itself required the Bakers to expend sums on their attorney to defend against the foreclosure, which the Bakers suggest have been recognized by Louisiana courts as an exception to the general "American rule" regarding attorney's fees awards.

## COUNT TWO:
## ABUSE OF PROCESS

112.  The Bakers incorporate by reference to the contents of ¶¶ 1-111, above, as if they were re-alleged in their entirety herein.

113.  Newtek's purpose is not to make itself whole or to protect collateral it believes rightly secures a valid debt.

114.  Rather, Newtek seeks a windfall or extract sums above and beyond what it would be owed even if the *BSI Notes* debt wasn't extinguished.[9]

115.  More specifically, Newtek has time and again solicited a "workout" from the Bakers in lieu of threatened foreclosure.

116.  Newtek's behavior in 2015 to date comes despite the fact that the Bakers and their attorneys have recited book, chapter, and verse why Louisiana law prohibits its continued pursuit of this dead debt.

117.  To further this ulterior purpose, Newtek prompted the sheriff to foreclose not only on collateral securing an already-extinguished debt, but it also asked for executory process to issue against a valuable piece of waterfront property which never secured any debt at all and in which Newtek never had any hope for a security interest.

118.  Newtek's malfeasance entitles the Bakers to the same sort of general and special damages described in ¶¶ 109-111.

---

[9] In 2011, when Newtek made the loans represented by the *BSI Notes*, it appraised the Camp Villere Facility at over 2.8 million dollars. When it seized and sold itself that property (which had been improved substantially) in 2014, it was made whole, particularly where the price Newtek paid at the sheriff's sale was less than 5% of the fair market value of the Camp Villere Facility.

## COUNT THREE:
## UNFAIR AND DECEPTIVE TRADE PRACTICES

119.  The Bakers incorporate by reference to the contents of ¶¶ 1-118, above, as if they were re-alleged in their entirety herein.

120.  Louisiana's Unfair and Deceptive Trade Practices Law (commonly called "LUTPA") does not countenance every contractual dispute; rather, it prohibits meaningful and morally wrong practices which are themselves unfair. LA. REV. STAT. § 51:1405, *et seq*.

121.  Newtek's practices fit squarely within the "unfair" category required to impose LUTPA's enhanced remedies:

   a.  knowingly encumbering an immovable in which it never had a security interest with an inappropriate UCC filing;

   b.  doing so even after the principal debt was extinguished by the LDJA;

   c.  refusing for years to cancel a mortgage extinguished by the extinction of the principal debt (*BSI Notes*) by LDJA;

   d.  knowingly seizing property in which it never had a security interest;

   e.  knowingly seizing property in which its security interest had been extinguished with the principal debt (*BSI Notes*) by application of the LDJA; and

   f.  refusing to litigate these meaningful issues *via ordinaria* and instead subjecting the Bakers, despite being counseled by two sets of attorneys, to a needless and legally unsupportable foreclosure proceeding.

122.  Newtek's behavior in 2015 to date comes despite the fact that the Bakers and their attorneys have recited book, chapter, and verse why Louisiana law prohibits its continued pursuit of this dead debt.

123. Additionally, in Louisiana, even legally justified actions (which Newtek's were not) which are "tantamount to an abuse of process" satisfy LUTPA requirements as unfair or deceptive trade practices. As shown above, Newtek's use of executory process here was abusive and satisfies Louisiana's elements for the tort – and is more than merely "tantamount to" abuse of process.

124. The Bakers are entitled to general and special damages as already outlined, and if liability under LUTPA is demonstrated they are entitled to mandatory statutory attorney's fees and costs under LA. REV. STAT. § 51:1409.A.

125. And once Newtek is put on notice as prescribed by LA. REV. STAT. § 51:1409.A, if its conduct does not cease, the Court should enhance the Bakers' damages (up to treble) under LUTPA § 1409.A.

## COUNT FOUR:
## SLANDER OF TITLE

126. The Bakers incorporate by reference to the contents of ¶¶ 1-126, above, as if they were re-alleged in their entirety herein.

127. It cannot be disputed that Newtek encumbered the Bakers' property by inappropriately recording a UCC1 financing statement against Lot 127.

128. And it's equally beyond dispute that Newtek continued to encumber the Bakers' home with a mortgage when the underlying debt had years before been extinguished when Newtek sold itself millions of dollars worth of property for pennies on the dollar without appraisal.

129. Malice is shown in Louisiana by reference to the actor's ulterior motive; here, Newtek's motive in encumbering the Bakers' property was not to secure a debt; it was to extract additional compensation above and beyond what the law would allow.

130. Malice can also be inferred from circumstantial evidence, such as Newtek's repeated assurances to the Bakers that the SBA controlled their fate when, in reality, Newtek hadn't mentioned this debt to the SBA because it preferred to violate the SBA's standard procedures in disposition of collateral and acquisition of property.

131. Here, Newtek's continued encumbrance of both Lot 127 and the Roan Lane Home amounts to a slander of title under Louisiana law, entitling the Bakers to all manner of general and special damages already outlined above.

**COUNT FIVE:**
**BREACH OF CONTRACT**

132. The Bakers incorporate by reference to the contents of ¶¶ 1-131, above, as if they were re-alleged in their entirety herein.

133. Although Newtek created itself a tort duty by its actions already described above, it owed certain contract-based duties to the Bakers.

134. Namely, upon the extinction of the *BSI Notes*, Newtek had to cancel the inscription of the mortgage against the Roan Lane Home.

135. Newtek's failure to perform entitles the Bakers to damages foreseeable by Newtek.

**COUNT SIX:**
**BREACH OF THE IMPLIED DUTY OF**
**GOOD FAITH AND FAIR DEALING**

136. The Bakers incorporate by reference to the contents of ¶¶ 1-135, above, as if they were re-alleged in their entirety herein.

137. Newtek's motives in misrepresenting the validity of an extinguished debt, in seeking executory process under the guise of contract rights, and in advising the Bakers that

a federal agency controlled their fates all rise to the level of bad faith and therefore violate the implied duties owed by parties to a Louisiana contract.

138. Based on their bad faith breach of contractual duties surrounding the notes, guaranties, and mortgages, which were confected in Louisiana, Newtek should be cast in judgment for all damages suffered by the Bakers, both those foreseeable and otherwise, to include all general and special damages described above.

**WHEREFORE,** Robert A. Baker and Elsa M. Baker pray this *Complaint* be deemed good and sufficient, that it be assigned a cause number in a division of this Honorable Court and that after all legal delays and proceedings are had, that judgment be rendered in their favor and against defendant Newtek, for all relief appropriate, all premises considered, whether contractual, legal, equitable, or customary.

Respectfully submitted,

**LILLY PLLC**

*/s/ Andrew T. Lilly*
**Andrew T. Lilly (La. 32559)**
317 Exchange Place
New Orleans, Louisiana 70115
t: (504) 812-6388
f: (504) 539-4180
e: andrew@atlpllc.com

***Attorney for plaintiffs,***
***Robert A. Baker and Elsa M. Baker***